UNITED STATES DISTRICT COURT | <u>FOR ONLINE PUBLICATION ONLY</u>
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------x
                                                 :

ANTHONY FLEMING,                :
                                                 :

                    Plaintiff,      :     MEMORANDUM
                                                 :     <u>AND ORDER</u>
      -against-               :     06-CV-00020 (JG)
                                                 :

MICHAEL J. ASTRUE,           :
Commissioner of Social Security,   :
                                                 :

                    Defendant    :
                                                 :
-------------------------------------------------------x
A P P E A R A N C E S

       HERBERT S. FORSMITH
           26 Broadway, 17th Floor
           New York, New York 10044
           *Attorney for Plaintiff*

       LORETTA E. LYNCH
           United States Attorney
           Eastern District of New York
           271 Cadman Plaza East
           Brooklyn, New York 11201
       By:    Karen T. Callahan
           *Attorney for Defendant*

JOHN GLEESON, United States District Judge:

          Anthony Fleming seeks review, pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3),

of the Social Security Commissioner's determination that he is not entitled to disability insurance

benefits under Title II of the Social Security Act. The Commissioner moves for judgment on the

pleadings, pursuant to Fed. R. Civ. P. 12(c), asking the Court to affirm his decision respecting

Fleming's alleged disability. Fleming cross-moves for judgment on the pleadings, seeking an

order remanding the case solely for the award of disability benefits from October 18, 2002. For

the reasons stated below, the Commisioner's motion is denied, and Fleming's motion is granted,

but only to the extent that the Commissioner's decision is reversed and the case is remanded for further proceedings.

BACKGROUND

A.     *Procedural History*

Fleming applied for disability benefits under Title II of the Social Security Act on June 2, 2003, claiming disability as of October 18, 2002.  R. at 44.  He claimed that he became unable to work as of that date because of chronic pain in his back, shoulder, and knees resulting from multiple surgeries and a degenerative bone disorder, *id*. at 53, and because of shortness of breath, *id*. at 294.  A hearing was held before Administrative Law Judge ("ALJ") Harold Rosenblum on April 11, 2005.  *See id*. at 281-314.  Fleming, who was represented by counsel, testified.

On July 27, 2005, the ALJ held that Fleming was not disabled within the meaning of the Social Security Act because his medical impairments did not prevent him from performing his past relevant work.  *Id*. at 13, 17.  The Appeals Council denied Fleming's request for review on October 28, 2005.  *Id*. at 5.  On January 4, 2006, Fleming filed a *pro se* action in this Court seeking review of the ALJ's determination.  On July 18, 2006, Fleming submitted to this Court material medical records that were not included in the administrative record.  On the agreement of the parties and pursuant to the sixth sentence of 42 U.S.C. § 405(g), I reversed and remanded the case on August 30, 2006 for further administrative proceedings to consider the additional records.

Meanwhile, on May 6, 2006, Fleming filed a claim for Supplemental Security Income under Title XVI of the Social Security Act.  *See* R. at 340.  On remand, Fleming's application for disability benefits was consolidated with his SSI application, and both were

2

considered at a hearing held on June 20, 2007 before ALJ Rosenbaum.  *Id*. at 340, 379.  Fleming, represented by new counsel, testified at the hearing, as did medical expert Dr. Richard Wagman. *Id*. at 372-442.  On August 29, 2007, the ALJ issued an opinion finding that Fleming was disabled within the meaning of the Social Security Act as of May 30, 2006, the date his SSI application was filed.  *Id*. at 341.  The ALJ also determined that Fleming had acquired sufficient quarters of coverage under the Act to remain insured under Title II only through December 31, 2004.  *Id.*  As the ALJ had concluded that Fleming was not disabled prior to that date, he also concluded that Fleming was not entitled to a period of disability or to disability insurance benefits.  *Id*. Accordingly, the ALJ granted Fleming's SSI application but denied his application for disability benefits under Title II of the Act.[1]

The Appeals Council denied Fleming's request for review on October 31, 2009, *id.* at 219-21, rendering the ALJ's August 29, 2007 decision the final decision of the Commissioner, *see DeChirico v. Callahan*, 134 F.3d 1177, 1179 (2d Cir. 1998).  The Commissioner requested that this Court reopen Fleming's appeal, and the parties subsequently filed cross-motions for judgment on the pleadings.  Oral argument was heard on the motions on October 22, 2010.  Fleming is represented in these proceedings by new counsel.

B.      *Fleming's Age, Education, Family, and Work History*

Anthony Fleming was born on April 17, 1961.  He indicated in his disability reports that he had completed two years of college, R. at 59, 75, but stated at the April 11, 2005 hearing that his formal education ended with high school, *id.* at 284.  Fleming also completed labor management training.  *Id.* at 59.  As of June 20, 2007, Fleming lived with his wife, his

---

[1]      Fleming does not challenge the Commissioner's determinations that he was disabled on May 30, 2006 and thereafter, and that he was entitled to SSI benefits as of May 30, 2006.  Accordingly, those determinations are not subject to this Court's review, and remain undisturbed as the final determinations of the Commissioner.

sixteen year-old daughter and his wife's eighteen year-old daughter. *Id*. at 393; *see also id*. at 22-23. In addition, Fleming has five children who do not live with him.

Until October 18, 2002, the date on which he claims he became disabled, Fleming worked as a supervisor for the New York City Parks Department. *Id.* at 63, 284. Fleming held that job for approximately eighteen months. *Id*. at 284. Previously, Fleming had worked as Director of Material Management for the Greater New York Nursing Home Association, as a union representative, as assistant district manager for a community board, as assistant director for a nursing home, and as a consultant for a health insurance organization. *Id*. at 63, 284-89. Fleming earned no income in 1998 or in any year after 2002. *Id*. at 48. In addition, in 1997, he earned only $74.24. *Id*.

C.    *Fleming's Description of His Medical Condition*

In connection with his application for benefits, Fleming complained of chronic pain in his back, shoulder, and knees, which he attributed to three surgeries in less than two years and a degenerative bone disease. R. at 53, 62. He stated that he had been bothered by pain since September 1997, *id*. at 53, and he claimed to feel pain when lifting, standing, walking, sitting, kneeling, and squatting, *id*. at 83. At the April 11, 2005 hearing, Fleming testified that he had had multiple surgeries for problems with the joints in his knees, shoulders, and back, and that he wore a brace on each knee, a shoulder immobilizer, and a back brace. *Id.* at 290-91.

In addition to the problems with his joints, Fleming testified that he was unable to hold a pen or pencil in his right hand. *Id*. at 291. He also complained of high blood pressure, *id.* at 309, and shortness of breath, which rendered him unable to walk more than a single block without medication, *id*. at 294. Fleming reported having to rest for ten to twenty minutes each time he walked one block. *Id*. at 84. Fleming testified that he had visited hospitals on about six

occasions due to shortness of breath and pain in his left arm, including one time in December 2002 when he collapsed in the street. *Id*. at 309-10. As of April 11, 2005, he was on six medications, which he took daily for pain, high blood pressure, and heart palpitations. *Id*. at 300-303. Fleming testified that he made weekly visits to Drs. Dalbir K. Chhabra and Inderpal S. Chhabra, a husband and wife team at Lefferts Medical Associates, whom he had been seeing since either late 2002 or late 2003. He also testified that the Drs. Chhabra recommended tests and MRIs that he was unable to obtain because he was uninsured and could not afford to pay for them. *Id*. at 425.

Although he indicated in his disability reports that he did not drive because of the medications he was on, *id.* at 81, Fleming testified on April 11, 2005 that he was able to drive and sometimes did drive himself to his weekly doctor's appointments, which were approximately ten minutes away from his house. *Id*. at 297. Fleming reported spending his days reading, watching television, and meditating, *id.* at 82, 308, but he also testified that he did what he could around the house, including making the bed, vacuuming on occasion, taking the trash to the incinerator room, and getting the mail, *id*. 303-304, 308. Most weeks, Fleming was able to attend church, where he served as a deacon, but he missed some Sundays as a result of his ailments. *Id*. at 307-308. He was able to use a computer to type the lessons that he taught at church when he was able to attend. *Id*. at 311. Fleming testified that he rarely left the house other than to go to church or to the doctor, although he sometimes sat outside with a pillow and read until he became too uncomfortable. *Id*. at 308.

By the time he testified at the June 20, 2007 hearing, Fleming had not been to church in almost two years. *Id*. at 397. He said that he spent his days taking medication, watching television, and sleeping, *id.* at 399. He had a stroke in June 2006, which left him

mostly blind in the right eye. *Id*. at 383-84. He could not remember when he began sleeping all day but knew that it was before the stroke. *Id*. at 399. He testified that he was still experiencing high blood pressure, heart palpitations, and shortness of breath, and said that his respiratory problems became severe in 2004 and had gotten progressively worse since then. *Id*. at 391. At the time of the hearing, Fleming was still suffering from chronic pain in his back, his shoulder, his knees, and his right hand, and he stated that the pain left him barely able to walk. *Id.* at 383-86. His right hand was also affected by tremors, and he wore a sling on his right arm to help control the tremors. *Id*. at 383. In addition to the sling, the back and knee braces, and the shoulder immobilizer, Fleming reported using a cane. *Id*. at 383-84. He also testified to using a machine to help him breathe and taking medications to treat his high blood pressure, palpitations, blood clots, depressive symptoms, joint infections, and respiratory problems. *Id*. at 386, 388-91. He said that his doctors had encouraged him to undergo back surgery, but he had refused. *Id*. at 386.

D.      *The Medical Evidence*

1.      *Medical Records from 1985 to 2003*

Fleming's medical history dating back to 1985 is documented by records from Brookdale Hospital Medical Center, the Hospital for Special Surgery, and Dr. Murray J. Werzberger. These records reveal that Fleming has suffered from a complex array of medical conditions throughout his adult life.

Following a December 1985 automobile accident, Fleming suffered from a cerebral concussion, neck and back injuries, and headaches, which were treated at the Brookdale Hospital Medical Center ("Brookdale"). R. at 248-76, 171-80. In 1986, Fleming was treated for

a Baker cyst[2] in his left knee.  *Id*. at 92.  In 1998 and 1999, Fleming returned to Brookdale three

times.  He was treated for musculoskeletal pain in his chest in June 1988, *id*. at 241-43, and for

temporary loss of consciousness and migraine in November 1988, *id*. at 221.  In October 1989,

Fleming underwent surgery for right carpal tunnel syndrome.  *Id*. at 181-89, 218-19.

After a second car accident in May 1997, Fleming complained of persistent

symptoms of pain and mechanical symptoms in his left shoulder.  *Id.* at 98-100.  A magnetic

resonance imaging ("MRI") revealed a partial tear of the supraspinatus tendon,[3] and on October

20, 1997, arthroscopic surgery[4] was performed to address a labral tear.[5]  *Id*. at 100.  Fleming

underwent physical therapy, but his pain persisted.  *Id*.  Based on the results of a January 12,

1998 MRI, he was referred to the Hospital for Special Surgery for further evaluation.  *Id*.  Due in

part to "obvious pain in the left shoulder," and suspicions of a torn rotator cuff, *id*. at 102, a

second arthoscopy of the left shoulder was conducted at the Hospital for Special Surgery on

February 6, 1998.  *Id.* at 98-99.

From January to March 1999, Fleming underwent treatment with Dr. Murray

Werzberger for pain in his left knee.  *Id*. at 125, 127-28, 133-37, 140-44.  He complained of left

shoulder pain and trouble walking.  *Id*. at  127.  A January 12, 1999 MRI of Fleming's left knee

showed a small knee effusion,[6] but no tears.  *Id*. at 138-39.  Arthoscopy was scheduled for the

---

[2]        A Baker, or Baker's, cyst, also called a popliteal cyst, is a fluid-filled cyst that causes a bulge and a feeling of tightness behind the knee.  Mayo Clinic, *Baker's Cyst* (2010), http://www.mayoclinic.com/health/bakers-cyst/DS00448.

[3]        "The supraspinatus tendon attaches the suprasinatus muscle, which arise[s] from the shoulder blade, to the head of the arm bone at the shoulder joint."  HealthHype.com, *Supraspinatus Tendon – Tendinitis, Tendinosis and Tear*, (2009), http://www.healthhype.com/supraspinatus-tendon-tendinitis-tendinosis-and-tear.html.

[4]        Arthroscopy is a surgical procedure used to visualize, diagnose, and treat problems inside a joint. American Academy of Surgeons, *Arthroscopy* (2010), http://orthoinfo.aaos.org/topic.cfm?topic=a00109.

[5]        A labral tear is a tear in the labrum, a "cuff of cartilage . . . that forms a cup for the end of the arm bone (humerus) to move within.  The labrum circles the shallow shoulder socket (the glenoid) to make the socket deeper."  Jonathan Cluett, Labral Tear, *About.com: Orthopedics* (2006), http://orthopedics.about.com/od/shoulderelbow/a/labrum.htm.  A labral tear can cause aching within the shoulder joint, pain, and decreased range of motion.  *Id*.

[6]        An effusion is swelling due to the leaking of excess fluid.  R at 403.

left knee for May 5, 1999. *Id*. at 132. Meanwhile, on January 26, 1999, Dr. Werzberger noted that, after two surgeries on his left shoulder, Fleming required a replacement joint but had declined to receive one. *Id*. at 127.

Several years later, in March 2003, Fleming returned to Dr. Werberger and reported that he had been involved in yet another car accident in 2001, and had been hospitalized for almost a week. *Id*. at 126. He had had a blood clot in his left thigh and pain in his left knee and lower back. *Id*. Fleming reported to Dr. Werzberger that he had undergone physical therapy and pain therapy from April through October 2001. *Id*. At the time of his visit to Dr. Werzberger, Fleming complained of pain in his lumbosacral area[7] and his left knee and was taking medication to relieve the pain. *Id*. Dr. Werberger found clicking of the right shoulder and determined that Fleming was suffering from pain secondary to trauma from the motor vehicle accident. *Id.* He prescribed continued use of pain medications and referred Fleming to an orthopedist and a neurologist. *Id*.

On June 7, 2003, Fleming returned to the Brookdale emergency room complaining of low back and bilateral flank pain, headaches, and blurred vision. *Id*. at 159-170. He was prescribed a nonsteroidal anti-inflammatory. *Id*. at 165. Again, on October 7, 2003, Fleming visited Brookdale, complaining of back pain. *Id*. at 152. He was diagnosed with chronic back pain, prescribed a narcotic pain medication, and advised to visit the neurosurgery clinic. *Id*. at 153.

---

[7] "The section of the spine that makes up the low back is called the *lumbar spine*." Orthopod, *Lumbar Spine Anatomy* (2010), http://www.eorthopod.com/content/lumbar-spine-anatomy.

2. *LMA Records from 2003 to 2007*

The record suggests that Fleming began treatment with Drs. Dalbir K. Chhabra and Inderpal S. Chhabra[8] at Lefferts Medical Associates PC ("LMA") in late 2003 and visited their offices approximately two dozen times between then and March 2007. Fleming's first visit to LMA as documented in the record occurred on December 17, 2003. R. at 469. During that visit, Fleming provided an account of his 2001 automobile accident and reported a history of bronchitis and of shoulder and knee surgeries. *Id*. at 469. His knee and shoulder range of motion were found to be decreased, but no other abnormal findings were made. *Id*. at 469-70. Fleming was diagnosed with lumbar spasm,[9] cervical radiculopathy,[10] right knee pain and swelling, right elbow arthralgia,[11] and tingling in the right hand. *Id*. at 470. He was prescribed three separate medications for pain relief and was referred for neurological and orthopedic evaluations.

Beginning in the early months of the following year, a series of electrocardiogram ("EKG") results showed borderline abnormality with possible left atrial abnormality. *Id*. at 461 (EKG dated Feb. 3, 2004), 547 (EKG dated April 3, 2004); 492 (EKG dated Feb. 1, 2005). *But see id*. at 500-01 (EKG dated Feb. 6, 2004 showed normal results), 460 (EKG dated Dec. 3, 2005 showed normal results).

---

[8] The record does not make clear which of the Drs. Chhabra Fleming visited on each occasion. I therefore refer to the two doctors interchangeably as "Dr. Chhabra." To the extent the ALJ determines on remand that distinguishing between the records of the two doctors will assist in determining when Fleming became disabled, the ALJ must develop the record. *See* 20 C.F.R. § 404.1512(e)(1) ("When the evidence we receive from your treating physician . . . or other medical source is inadequate for us to determine whether you are disabled . . . [w]e will first recontact your treating physician . . . or other medical source to determine whether the additional information we need is readily available.").

[9] A lumbar spasm is caused by inflammation resulting from a strain or sprain of the muscles or ligments of the lower back. Jonathan Cluett, Low Back Strain, *About.com: Orthopedics* (2010), http://orthopedics.about.com/cs/sprainsstrains/a/lowback.htm.

[10] Cervical radiculopathy is a "nerve root injury . . . sometimes referred to as a 'pinched' nerve," which causes "neck pain that may radiate into the shoulder and arm." American Academy of Orthopaedic Surgeons, *Cervical Radiculopathy (Pinched Nerve)* (2010), http://orthoinfo.aaos.org/topic.cfm?topic=A00332.

[11] Arthralgia is "pain in the joints." MedicineNet.com, *Definition of Arthralgia* (1998), http://www.medterms.com/script/main/art.asp?articlekey=2343.

Fleming returned to LMA on March 11, 2004 and reported that, since his previous visit, he had gone to the emergency room in Alabama for treatment of very high blood pressure. *Id*. at 529. Fleming's blood pressure was again high at the time of his March 11 visit to LMA. *Id*. He also complained of back pain. *Id*. Fleming was diagnosed with hypertension. *Id*. A beta blocker and an aspirin were prescribed for the hypertension, while a narcotic pain reliever was prescribed for back and knee sprain. *Id*.

In April and May 2004, Fleming made three more visits to LMA. He complained of heart palpitations, shortness of breath, and back and knee pain. *Id*. at 526, 474, 486. Flemming was consistently diagnosed with hypertension and prescribed medication for his high blood pressure. *Id*. at 526, 474, 486. Fleming was also diagnosed in those months with sinus bradycardia,[12] lumbar spine sprain, multiple joint sprain, and cardiac arrhythmias. *Id*. at 526, 474, 486. He was consistently prescribed medication for pain relief. On May 8, 2004, Dr. Chhabra, made a note that Fleming was being treated symptomatically, as he could not afford diagnostic testing. *Id.* at 486.

In another note dated May 8, 2004, Dr. Chhabra wrote: "Mr. Anthony Fleming is my regular patient. He is suffering from [Lumbosacral] Radioculopathy & knee sprain. He cannot sit/stand for more than 15 min[utes]." *Id*. at 279. Similarly, in a letter dated August 8, 2004, Dr. Dalbir Chhabra stated that Fleming was a regular patient of LMA and was known to suffer with hypertension, cardiac arrhythmias, lumbosacral sprain, and knee sprain. *Id*. at 146. Dr. Chhabra concluded that Fleming was "unable to perform any work because of the above mentioned conditions." *Id*.

---

[12]     Sinus bradycardia is "[a] regular but unusually slow heart beat," which can lead to fainting. MedicineNet.com, *Definition of Sinus bradycardia* (2002), http://www.medterms.com/script/main/art.asp?articlekey=19707.

Fleming returned to LMA six times in July, August, and September 2004, and once again in November 2004.[13] *Id*. at 475-76, 478, 468, 498-99. His complaints and the physicians' assessments during these months were largely consistent with those made on earlier visits. *Id*. Fleming continued to receive prescriptions for blood pressure and pain medications. *Id*. Specifically, Fleming's "problems" were identified in September as degeneration of lumbar or lumbrosacral intervertebral disc, lumbago, unspecified essential hypertension, and undiagnosed cardiac murmurs. *Id*. at 472.

Fleming continued to visit LMA in early 2005. The records reflect four visits in the first three months of the year. *Id*. at 483-85, 487. Fleming regularly complained of pain in his right shoulder and knees and swelling in his left knee, *id*. at 484, 485, 487, as well as palpitations on occasion, *id*. at 483. Fleming continued to be prescribed medication for his pain and for his hypertension. *Id*. X-rays as well as orthopedic evaluation were recommended. *Id*. at 484.

On April 8, 2005, Dalbir Chhabra wrote a second letter stating that Fleming was a patient of LMA and was "suffering with chronic medical conditions such as Multiple Joint Pains after trauma, Hypertensive cardiovascular disease and Lumbar Radiculopathy," all of which rendered Fleming "totally disabled at this time."[14] *Id*. at 277. Dr. Chhabra expressed the opinion that Fleming's care was "hampered by lack of insurance and payment issues." *Id*. Dr. Chhabra attached to the letter a New York Motor Vehicle No-Fault Insurance form that he had completed on December 19, 2004, stating that Fleming's conditions – right shoulder and knee sprain,

---

[13] During one of these visits, on September 28, 2006, Fleming was seen by Dr. David A. Hess, not by one of the Drs. Chhabra.

[14] Dr. Chhabra's assessment was echoed in a non-medical opinion provided by the New York City Department of Social Services in a handwritten note on a July 15, 2005 printout. *Id*. at 315. The note stated that Fleming was "totally disable[d], and therefore exempt from working" for purposes of obtaining public assistance. *Id*.

lumbosacral radiculopathy and lumbosacral sprain, and hypertenstive heart disease – were solely the result of an automobile injury, and the injury had resulted in permanent disability.  *Id*. at 278.

Fleming did not visit LMA again until the beginning of December, 2005, at which point he began making approximately monthly visits through November 2006.  *Id*. at 480, 482,488-91, 493-94, 495-97.  He regularly complained of pain in his joints and continued to be diagnosed with hypertension.  *Id*.  An MRI taken on December 26, 2005 showed herniation of a disc[15] in Fleming's neck with impingement on the thecal sac.[16]  *Id*. at 502, 503, 506. A February 2, 2006 MRI showed joint effusion and a popliteal cyst.  *Id*. at 504.  An MRI of his right shoulder reflected tendinosis.[17]  *Id*. at 505.

3.    *Medical Records Concerning Fleming's 2006 Stroke*

In late June and early July 2006, Fleming experienced heaviness in his chest, weakness on his right side, and headaches.  R. at 560-679.  He was treated at Brookdale, where it was determined that he had had a stroke.  *Id*. at 575.  As a result, Fleming has been afflicted with numbness and weakness on his right side and near blindness in his right eye.  *Id*. at 578.

4.    *Consultative Examinations and State Agency Review*

On July 25, 2003, Fleming was consultatively examined by Dr. Khattak,[18] an orthopedist who found that Fleming walked without assistance, sat and stood normally, got on and off the examining table without any assistance, and could rise on his toes and heels and squat

---

[15]    "The bones (vertebrae) for the spine . . . are cushioned by small, spongy discs. . . . [W]hen a disc is damaged, it may bulge or break open.  This is called a herniated disc."  WebMD, *Herniated Disc – Topic Overview* (2008), http://www.webmd.com/back-pain/tc/herniated-disc-topic-overview.

[16]    "[I]n the lumbar spine there is no spinal cord.  Instead, the nerve roots hang like a 'horse[']s tail' in an enclosed . . . sac called the Thecal Sac."  Douglas M. Gillard, Disc Anatomy, *ChiroGeek.com* (2005), http://www.chirogeek.com/000_disc_anatomy.htm.

[17]    Tendinosis is "an inflamed or irritated tendon."  CaringMedical.com, *Condition: Tendinosis* (2010), http://www.caringmedical.com/conditions/Tendinosis.htm.

[18]    A  memorandum dated January 23, 2006 and circulated by the Acting Regional Chief Administrative Law Judge stated that Dr. Khattak had been removed as a consultative examiner in July 2005.  R. at 509.  The memorandum provided the following directive to ALJs: "If the files contain any reports from Dr. Khattak, care should be exercised in reviewing them and determining the weight to accord such examinations. . . . Such weight should be explained in the decision."  *Id*.

and rise from a squatting position. *Id*. at 110. Dr. Khattak found that, while there was pain on external rotation of the right shoulder, the range of motion of the shoulders was normal as were the joints of the elbow, forearm, and hands. *Id*. He also found that Fleming had decreased sensation in the left leg. *Id*. at 110-11. X-rays of the right shoulder and left knee were negative. *Id*. at 111. Khattak concluded that Fleming's "ability to bend and lift may be mildly limited, but there are no limitations in sitting, standing, walking or reaching with gross and fine manipulations in his hand. The claimant does not need any assistive devices for ambulation." *Id*.

A report was also completed by Dr. Gina Stubbs of the ArborWeCare program on July 7, 2006 based on a June 21, 2006 exam. *Id*. at 680-91. Stubbs reported that Fleming had suffered from worsening heart problems for ten years and high blood pressure for six years, which together caused shortness of breath, dizziness, nosebleeds, and blurred vision. *Id*. at 683. In particular, his shortness of breath had affected him for three years, since June 2003, when he was diagnosed with bronchitis. *Id*. at 686. His high blood pressure was severe and uncontrolled. *Id*. In addition, Stubbs reported that Fleming had significant arthritis and pain in multiple joints and in his back. *Id*. at 686. These conditions made basic daily functions, such as dressing and moving around the house, difficult. *Id*. at 683. Stubbs concluded that Fleming's "medical problems . . . significantly affect [his] functioning," recommended an orthopedic consult, and recommended that the ALJ consider awarding SSI and/or SSD benefits. *Id*. at 688-89.

On August 8, 2006, Dr. Marilee Mescon performed a consultative examination. *Id*. at 745-50. Mescon observed that Fleming walked with a limp and wore braces on his knees and back, but he did not use a cane. *Id*. at 747. She found decreased range of motion in his right shoulder and loss of strength and sensation in the upper right and lower right extremities. *Id*. at 748. Mescon found that Fleming's heart rhythm was regular, and that his joints were stable and

nontender.  *Id*. at 748.  X-rays of his knee, lumbosacral spine and chest were normal.  *Id*. at 749.

Mescon made a diagnosis of well-controlled hypertension, seizure disorder, history of stroke

with right hemiparesis[19] and sensory loss and memory loss, back pain, and a history of surgery

on his left knee, right hand, right wrist, and left shoulder.  Mescon found that plaintiff was not

restricted in sitting, although he was severely restricted in standing, climbing, pushing, pulling,

and carrying heavy objects.  *Id*. at 740.

E.      *The Medical Expert's Testimony*

                Dr. Richard Wagman testified as a medical expert at the hearing before ALJ

Rosenbaum on June 20, 2007.  Wagman was impressed by the complexity of Fleming's medical

problems.  R. at 423.  He reviewed the evidence contained in the record and concluded that

Fleming was "totally disabled" at the time of the hearing and had been since June 2006.  *Id*. at

406.  Furthermore, Wagman stated that Fleming was "significantly disabled prior to that," citing

significant problems with Fleming's lower back, his knees, and both shoulders, as well as his

shortness of breath.  *Id*. at 407-408.  According to Wagman, "[t]he time when I really feel that he

became disabled where we have problems, real problems, I would say started with 11-05 where

he had a right knee effusion.  He had a herniation of the disc demonstrated in 12-26-05 and so on

. . . . Without any question, [that's when his functional ability worsened]."  *Id*. at 409.  Wagman

testified that, in his opinion, Fleming was incapable of performing sedentary work as of

November 2005, "[a]nd things also got significantly worse after that."  *Id*. at 411.

                With respect to the medical conditions that led him to conclude that Fleming

could not work as of November 2005, Wagman testified that they were in existence "[t]o some

degree in December of 2004."  *Id*. at 424.  For instance, Fleming had back pain in December

---

[19]        "Hemiparesis is muscle weakness on only one side of the body."  Jose Vega, Hemiparesis, *About.com: Stroke* (2008), http://stroke.about.com/od/glossary/g/hemiparesis.htm.

2004. *Id*. at 427. Wagman stated that he did not "question [Fleming's] credibility at all," and that he fully believed Fleming's testimony with respect to pain. *Id*. at 430. Furthermore, Wagman found it reasonable to assume that the pain Fleming felt in 2005 was the same as the pain he felt in 2004, given his long history of problems and complaints. *Id*. at 428.

Wagman explained that he chose November 2005 as the date at which, in his opinion, Fleming became disabled, because the medical records at that point began to provide proof of disease that corresponded with Fleming's ongoing complaints of pain. *Id*. at 430. For instance, an MRI from December 2005 revealed a herniated disc in Fleming's neck, while an MRI in early 2006 showed "significant disease in his knee with an effusion, inflammation," which is "painful, very," and would cause Fleming to sit in pain at all times. *Id*. at 430. When asked whether it was reasonable to assume, based on his complaints of pain, that Fleming suffered from similar conditions in 2004 or earlier, Wagman stated:

> I believe him when he said he couldn't get an MRI done because of financial reasons. I understand that but I don't have the absolute proof in this record to document that what he had in '05 he had in '04. Could I suppose maybe this existed? Sure. That's not unreasonable. . . . He may have had the same degree [of pain in his knee from sitting in 2004 as in 2005], I don't know. That's not clearly documented.

*Id.* at 430-31.

## DISCUSSION

A.     *The Legal Standard*

Under the Social Security Act, Fleming is entitled to disability benefits if, "by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months," 42 U.S.C. § 423(d)(1)(A), he "is not only unable to do his previous work but cannot, considering his age,

education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy," *id*. § 423(d)(2)(A). The Commissioner decides whether the claimant is disabled within the meaning of the Act. 20 C.F.R. § 404.1527(e)(1). Under 42 U.S.C. § 405(g), I review the Commissioner's decision to determine whether the correct legal standards were applied, and whether the decision is supported by substantial evidence. *Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir. 1987).

The Social Security Administration's regulations prescribe a five-step analysis for determining whether a claimant is disabled:

> First, the Commissioner considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the Commissioner next considers whether the claimant has a severe impairment which significantly limits his physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations. If the claimant has such an impairment, the Commissioner will consider him disabled without considering vocational factors such as age, education, and work experience; the Commissioner presumes that a claimant who is afflicted with a listed impairment is unable to perform substantial gainful activity. Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work. Finally, if the claimant is unable to perform his past work, the Commissioner then determines whether there is other work which the claimant could perform.

*DeChirico*, 134 F.3d at 1179-80 (internal quotation marks and alterations omitted) (quoting *Berry v. Schweiker*, 675 F/2d 464, 467 (2d Cir. 1982)); *see also* 20 C.F.R. § 404.1520(a)(4)(i)-(v) (setting forth this process). The claimant bears the burden of proof in the first four steps, the Commissioner in the last. *Green-Younger v. Barnhart*, 335 F/3d 99 (2d Cir. 2003).

To be eligible for disability insurance benefits, Fleming must also be "insured for disability insurance benefits." 42 U.S.C. §§ 423(a)(1)(A), 423(c)(1). Pursuant to Sections

223(c)(1) and 202(a) of the Social Security Act, a claimant is insured for social security benefits in a given month if he has had at least forty "quarters of coverage," and if he has had at least twenty quarters of coverage during the immediately preceding forty quarters. *Id*. §§ 423(c)(1), 402(a); *see also Arnone v. Bowen*, 882 F.2d 34, 37 (2d Cir. 1989) (citing 20 C.F.R. § 404.130(b)). Section 213 of the Act defines a "quarter of coverage" as a quarter in which a claimant has earned a specified minimum amount of income. 42 U.S.C. § 413(2). In other words, a claimant is insured under Title II of the Social Security Act if he has earned income for a total of ten years, and for a total of five years within the last ten years. The last date on which a claimant is insured under Title II is known as his "last date insured." Fleming is entitled to disability benefits only if he became disabled prior to his last date insured. *See Arnone*, 882 at 38 ("[R]egardless of the seriousness of his present disability, unless [claimant] became disabled before [his last date insured], he cannot be entitled to benefits.").

B.    *Reversible Errors in the ALJ's Decision*

1.    *The ALJ's Rejection of Fleming's Disability Claims*

The ALJ followed the five-step procedure outlined above for determining whether Fleming was disabled within the meaning of the Act. He determined, first, that Fleming had not engaged in substantial gainful activity since October 8, 2002.[20] R. at 343. The ALJ then determined that Fleming was afflicted with severe impairments – "status post shoulder repair [and] status post cerebrovascular accident 2006" – but that this combination of impairments did not constitute a listed impairment. *Id*. Performing the fourth step of the analysis, the ALJ concluded that Fleming had "the residual functional capacity to perform the full range of

---

[20]    This determination is not supported by the record. The record reflects that Fleming worked until October 18, 2002, not October 8, and the ALJ noted as much in his July 27, 2005 decision prior to remand. R. at 14, 16. I therefore conclude that the October 8, 2002 determination is a clerical error that should be corrected on remand.

sedentary work. He can lift/carry up to ten pounds; stand/walk two hours in an eight hour workday; and sit for six hours in an eight hour workday." *Id.* Nonetheless, the ALJ determined that Fleming was unable to perform any past relevant work. *Id.* at 347. Finally, at the fifth step, the ALJ found that Fleming was unable to engage in any other work and was therefore disabled within the meaning of the Act. *Id.* However, the ALJ determined that the onset date of Fleming's disability was May 30, 2006, the date on which he filed his SSI application, and that prior to that date, "there are jobs that exist in significant numbers in the national economy that the claimant can perform." *Id.* Finally, because May 30, 2006 is clearly after Fleming's last date insured – December 31, 2004[21] – the ALJ concluded that Fleming was not entitled to any disability benefits under Title II of the Act. *Id.* at 343, 347-48.

        2.     *The Arbitrariness of the ALJ's Determinations*

        The determinations arrived at by the ALJ in the fourth and fifth steps of his analysis are arbitrary in light of the record and are unsupported by substantial evidence. First, the ALJ's reasoning in the fourth stage of analysis is both internally inconsistent and, at least in part, unsupported by the record. The ALJ determined that, at the time of his decision, Fleming was capable of performing the full range of sedentary work, and that Fleming could not perform any past relevant work. R. at 343, 347. Together, these two conclusions are illogical, as Fleming's past relevant work, "as a purchase agent, contract negotiator, and director of human resources," included sedentary work that did not require physical exertion beyond that which the ALJ concluded Fleming could perform. *See id.* at 343, 347.

---

[21]     In an October 19, 2010 order I expressed uncertainty about the accuracy of the ALJ's last date insured calculation. However, in supplemental briefing submitted on October 21, 2010, both parties drew my attention to Fleming's earnings reports. *See* R. at 47-48; Comm'r's Letter Response to Order Dated Oct. 19, 2010 at Ex. A, B, Oct. 21, 2010, ECF No. 34 (Fleming's updated earnings report). Based on these reports, I am satisfied that substantial evidence exists to support the ALJ's determination that Fleming was insured under the Act only through December 31, 2004.

Additionally, there is no evidence in the record to support the ALJ's determination that, at the time of his decision, Fleming could "lift/carry up to ten pounds; stand/walk two hours in an eight hour workday; and sit for six hours in an eight hour workday." *Id*. at 343. In late June 2006, Fleming suffered a stroke that left him weakened and numbed on his right side and nearly blinded in his right eye. *Id*. at 578. After the stroke, Fleming was afflicted by tremors in his right hand, and he wore a sling on his right arm in an effort to control the tremors. *Id*. at 383. The medical expert, Dr. Wagman, testified that Fleming had become "totally disabled" by June 2006. *Id*. at 406. Wagman also testified that the effusion in his knee as shown in an MRI taken in early 2006 prevented Fleming from sitting other than in severe pain, *id*. at 430. In Wagman's opinion, Fleming had been unable to perform sedentary work since November 2005.[22] The ArborWeCare report completed on July 7, 2006, also concluded that Fleming suffered from significant pain in multiple joints in his back that impaired his ability to engage in even the most basic daily functions, like dressing and moving around the house. *Id*. at 686, 683.

The only evidence in the record that even remotely supports the ALJ's determination that Fleming could perform sedentary work is found in Dr. Mescon's August 8, 2006 report, where she opined that Fleming was not restricted in sitting, but even she concluded that Fleming was severely restricted in standing, climbing, pushing, pulling, and carrying heavy objects. *Id*. at 740. Finally, as discussed more fully below, in determining that Fleming was capable of performing the full range of sedentary work, the ALJ erroneously disregarded

---

[22]     The ALJ mischaracterizes Wagman's testimony. According to the ALJ, "When [Wagman] was specifically asked if there was any point in time prior to June 2006 when the claimant could not perform sedentary work, Dr. Waman opined that the claimant could not perform sedentary work *during* the month of November." R. at 345 (emphasis added). This was not Wagman's testimony. When asked whether there was any time that Fleming "was incapable of performing sedentary work," Wagman responded, "I think it really *starts with* November '05. . . . And things got significantly worse after that." *Id*. at 411 (emphasis added).

Fleming's own testimony respecting his symptoms, as well as the records and opinions of his treating physicians. *See id.* at 343-46.

Ultimately, because the ALJ determined that Fleming could not perform his past relevant work despite his capabilities, the erroneous nature of his findings concerning those capabilities was irrelevant to his final decision. However, the illogic of the reasoning applied in the fourth step of the analysis highlights the arbitrariness of the ALJ's conclusions throughout the decision.

There is also a pronounced arbitrariness to the ALJ's conclusions in the fifth stage of analysis. The ALJ determined that Fleming was disabled "only from May 30, 2006, the SSI application date, through the date of this decision, [August 27, 2006,]" and that prior to May 30, 2006, "there are jobs that exist in significant numbers in the national economy that the plaintiff can perform." *Id.* at 347. The ALJ identified no evidence in the record to support this determination. He seems to have picked the date simply because it was the date on which Fleming filed his SSI application. *See id.* at 344 ("The record only supports a finding of disability as of May 30, 2006, the SSI application date."), 346 ("[I]t is found that the claimant is only 'disabled' within the meaning of the Social Security Act as of May 30, 2006, the SSI application date."), 347 ("The claimant has been under a disability, as defined in the Social Security Act, only from May 30, 3006, the SSI application date, through the date of this decision."). The ALJ's finding is unsupported by the evidence in the record, which provides no indication that Fleming's condition changed on May 30, 2006.

The record contains many competing opinions as to when Fleming became disabled, but none of them supports the ALJ's determination. Wagman testified that Fleming became "totally disabled" in June 2006, *id.* at 406, and he made clear that he was referring to the

date on which Fleming suffered from a stroke, *id.* at 404, which was at the very end of that month, *id.* at 560-679.  Wagman also testified that Fleming was incapable of performing sedentary work as of November 2005.  *Id.* at 411.  Fleming claimed to have become disabled by October, 2002, *id.* at 44, and his treating doctors, the Drs. Chhabra, opined on three occasions prior to May 30, 2006 – on May 8, 2004, on August 8, 2004, and on April 8, 2005 – that Fleming was disabled and unable to work, *id.* at 27, 146, 277.  In addition, the New York City Department of Social Services had determined by the summer of 2005 that Fleming was "totally disable[d], and therefore exempt from working" for purposes of obtaining public assistance."  *Id.* at 315.  The ALJ disregarded each of these opinions and instead settled on May 20, 2006 without explaining his determination or citing to any evidence in support of his conclusion.  The determination is unsupported by substantial evidence.

3.      *The Failure to Observe the Treating Physician Rule*

Under the regulations, a treating physician's opinion about a claimant's impairments is entitled to "controlling weight" if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record."  20 C.F.R. § 404.1527(d)(2); *see also Schisler v. Sullivan*, 3 F/3d 536, 568 (2d Cir. 1993) (upholding regulations).  The Commissioner must set forth "good reasons" for refusing to accord the opinions of a treating physician controlling weight.  He must also give "good reasons" for the weight actually given to those opinions if they are not considered controlling. 20 C.F.R. § 404.1527(d)(2); *see also Halloran v. Barnhart*, 362 F.3d 28, 33 (2d Cir. 2004) ("We do not hesitate to remand when the Commissioner has not provided 'good reasons' for the weight given to a treating physician[']s opinion and we will continue remanding when we encounter opinions from ALJs that do not comprehensively set forth reasons

for the weight assigned to a treating physician's opinion."); *Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999) ("Under the applicable regulations, the Social Security Administration is required to explain the weight it gives to the opinions of a treating physician.").  When the Commissioner does not give a treating physician's opinion controlling weight, the weight given to that opinion must be determined by reference to: "(i) the frequency of examination and the length, nature, and extent of the treatment relationship; (ii) the evidence in support of the opinion; (iii) the opinion's consistency with the record as a whole; (iv) whether the opinion is from a specialist; and (v) other relevant factors."  *Schall v. Apfel*, 134 F.3d 496, 503 (2d Cir. 1998) (citing 20 C.F.R. § 416.927(d)(2)).

In this case, the Drs. Chhabra treated Fleming regularly over an extended period of time, yet the ALJ summarily rejected their opinion – stated twice prior to December 31, 2004, and once more prior to May 30, 2006 – that Fleming was unable to work due to his various ailments and conditions.  *See* R. at 346 ("[I]t is noted that a review of the entire record indicated that no treating or examining physician issued a medically supported opinion that the claimant was totally disabled from work prior to December 31, 2004 . . . .").  The ALJ's failure to give any, let alone controlling weight to the Chhabras' opinions, and his failure to explain his reasons for entirely disregarding them were erroneous.

In addition, the ALJ erred in giving no weight to the underlying medical observations that gave rise to the Chhabras' multiple determinations that Fleming was disabled.  *See id.* at 345 ("[D]espite conclusory statements by Dr. Chhabra that the claimant is disabled, there are no supporting records cited to, or attached to these statements.").  The Chhabras' records belie the ALJ's repeated statement that "there is simply no supportive medical evidence contained in the records showing 'disability' prior to the expiration of the claimant's insured

status." *Id*. at 345; *see also id.* at 346 ("[O]ther than testimony, the claimant offered no medical evidence to support 'disability' prior to December 31, 2004 . . . ."). The ALJ selectively referred to the records provided by the Chhabras, citing notes and records that purportedly "show the claimant's signs/symptoms to be essentially within normal limits," as well as one EKG and one MRI, which showed normal results. *Id.* at 345. Meanwhile, the ALJ made no mention of the Chhabras' myriad notes reflecting Fleming's ongoing medical complaints, diagnosing Fleming with such conditions as hypertension, cardiac arrhythmias, lumbosacral sprain, and knee sprain, and consistently prescribing medication for these conditions. The ALJ similarly ignored MRI results showing herniation of a disc in Fleming's neck, *id*. at 502, 503, 506, and EKG results repeatedly showing borderline abnormality with possible left atrial abnormality, *id* at 461, 547, 492. The ALJ offered no explanation as to why he chose to disregard these records. This was an improper application of the treating physician rule. On remand, the ALJ should consider the Chhabras' opinions, determine whether these opinions are entitled to controlling weight, and, if not, set forth comprehensive reasons explaining the weight to which they are entitled.

      4.    *The Baseless Adverse Credibility Finding*

      In determining whether a plaintiff is disabled, the Commissioner must consider subjective evidence of pain or disability testified to by the plaintiff, but "may exercise discretion in weighing the credibility of the claimant's testimony in light of the other evidence on the record." *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010) (citations omitted). As noted by the ALJ, R. at 343-44, and by the Second Circuit, the regulations set forth a two-step process for evaluating a claimant's assertions of pain and disability:

> At the first step, the ALJ must decide whether the claimant suffers from a medically determinable impairment that could reasonably be expected to produce the symptoms alleged. . . . If the claimant does suffer from such an impairment, at the second step, the ALJ

must consider the extent to which the claimant's symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence of record. The ALJ must consider statements the claimant or others make about his impairments, his restrictions, his daily activities, his efforts to work, or any other relevant statements he makes to medical sources during the course of examination or treatment, or to the agency during interviews, on applications, in letters, and in testimony in its administrative proceedings.

*Genier*, 606 F.3d at 49 (quotation marks and alterations omitted) (citing 20 C.F.R. §§ 404.1529(a), 404.1512(b)(3); S.S.R. 96-7p).

Here, the ALJ found that "the claimant's medically determinable impairments could reasonably be expected to produce the alleged symptoms," but at the second stage of the analysis, he concluded that "the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible prior to the expiration of his insured status on December 31, 2004." R. at 345. In finding Fleming's testimony not credible, the ALJ stated only that there was "*no* medical evidence to support 'disability' prior to December 31, 2004" and referred to, but did not discuss, "the claimant's relatively conservative medical treatment history,[23] his testimony concerning his activities of daily living and past job duties,[24] medical expert testimony, the claimant's retained exertional capacity, and objective medical

---

[23]     The ALJ made no reference to the explanation provided by Fleming for the relative absence in the record of MRIs and other clinical and laboratory diagnostic findings. *See* R. at 425 ("The reason those things were not done is because no one was paying for them. They wanted them done. I went to five different MRI places that Dr Chabra [sic] sent me and they wouldn't do it without having some source of payment."); *see also id*. at 486 (May 8, 2004 note by Dr. Chhabra that Fleming could not afford diagnostic testing). Nor did the ALJ acknowledge the constant stream of medications prescribed to and taken by Fleming to treat, among other things, his pain and high blood pressure.

[24]     To the extent that the ALJ did discuss Fleming's testimony concerning his daily activities, the discussion seems to weigh in Fleming's favor, not against it. The ALJ observed that Fleming testified that he could no longer attended church, that he spent his days sleeping, that his condition has worsened every year, and that he could not perform household chores or activities. R. at 346. The ALJ also noted that Fleming's testimony was consistent with the allegations he made in his disability benefits application. *Id*. ("At the hearing, the claimant essentially repeated allegations made in his application.").

evidence which reflected minimal or stabilized medical conditions as of December 31, 2004."[25]

*Id*. at 346 (emphasis added). As discussed above, in finding "no medical evidence to support disability prior to December 31, 2004," the ALJ disregarded the records of Fleming's treating physicians that contain evidence of myriad physical impairments and medical conditions prior to December 31, 2004.

The ALJ also disregarded the medical expert's testimony that Fleming's claims about his pain and other symptoms were entirely credible based on the record. *Id*. at 430-31. Wagman observed that there was no "absolute proof" in the record prior to November 2005 – no clinical or laboratory records – that Fleming suffered from the disabilities to which he testified. *Id*. But Wagman also stated that, based on the evidence available in the record, it was reasonable to assume that Fleming's testimony about his symptoms was entirely accurate. *Id*; *see also id.* at 428 (Wagman finding reasonable the assumption that Fleming felt as much pain in 2004 as in 2005). Wagman also found credible Fleming's explanation for the dearth of conclusive proof of disability prior to November 2005 – that he could not afford MRIs and other diagnostic tests. *Id*. at 430.

The ALJ erred in conclusively determining that Fleming's testimony concerning his pain and other symptoms was "not entirely credible prior to the expiration of his insured status on December 31, 2004." *Id*. at 345. Before finding Fleming not credible, the ALJ was required to consider all of the evidence on record and to discuss with specificity the ways in

---

[25]    In discrediting Fleming's testimony, the ALJ also stated that he was "found to have a very strong attitude." R. at 346. The ALJ also commented on Fleming's "attitude" at the June 20, 2007 hearing. At the very outset of the hearing, Fleming reminded the ALJ that the ALJ had "yelled at" him on an unspecified previous occasion. *Id*. at 374. The ALJ responded, "If you're going to start off with an attitude I'm going to discontinue the proceedings and so forth," and then admitted to having yelled at Fleming on a prior occasion. *Id*. at 374. In his written decision, in addition to commenting on Fleming's "strong attitude," the ALJ reported that Fleming had "adamantly stated that he will not cooperate with SSI because he feels that as he has worked, he is due disability benefits, not SSI." *Id*. at 346. No such statements by Fleming are reflected in the record. Even if they were, they would not serve as a basis for disregarding Fleming's testimony about his symptoms and pain.

which Fleming's testimony was contradicted by the other evidence in the record.  If, on the other hand, Fleming's testimony was supported by the evidence in the record, the ALJ was required to consider that testimony in determining the onset date of Fleming's disability.

C.    *The Need for Remand to Determine the Onset Date of Disability*

Fleming asks this Court to direct the Commissioner to grant his disability benefits application as of October 18, 2002, and to remand solely for the calculation of benefits. However, the record does not require a finding of disability as of October 18, 2002 as a matter of law.  I therefore leave it to the Commissioner, in the first instance, to determine when Fleming became disabled within the meaning of the Social Security Act.  Remand is particularly appropriate in this case where Fleming has not yet received a full and fair administrative hearing.

In reviewing the record, I have been troubled by the appearance that the ALJ's determination was based at least in part on animosity toward Fleming and toward me.  The Second Circuit has directed courts reviewing the Commissioner's decisions to "first satisfy [themselves] that the claimant has had 'a full hearing under the Secretary's regulations and in accordance with the beneficent purpose of the Act."  *Echevarria v. Sec'y of Health & Human Servs.*, 685 F.2d 751, 755 (2d Cir. 1982) (quoting *Gold v. Sec'y of Health, Educ. & Welcfare*, 463 F.2d 38, 43 (2d Cir. 1972)).  The unnecessarily contentious nature of the June 20, 2008 hearing and the aggressive tone of the ALJ's August 29, 2007 decision create the specter that the Commissioner's determination was not the result of a fair proceeding.  Even if substantial evidence existed to support the Commissioner's decision, that decision would be marred by this fundamental procedural flaw.   On remand, the Commissioner is directed to provide Fleming with a hearing before an ALJ who will fulfill his statutory duty to issue an unbiased decision based on a fair process and the evidence before him.

## CONCLUSION

For the reasons stated above, the Commissioner's motion for judgment on the pleadings is denied, and Fleming's motion is granted, but only to the extent that the case is remanded to the Commission for further proceedings.

So ordered.

John Gleeson, U.S.D.J.

Dated: November 2, 2010
        Brooklyn, New York